**UNITED STATES of America, Plaintiff,**

v.

**Larry Lowell TICKNOR, Defendant.**

**No. CR72–4010.**

United States District Court, D. South Dakota, S. D.

June 12, 1973.

Robert D. Hiaring, Asst. U. S. Atty., Robert Sikma, Sp. Asst. U. S. Atty., and E. George Peterson, Small Business Administration, Sioux Falls, S. D., for plaintiff.

Lawrence L. Piersol and Michael F. Pieplow, of Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., for defendant.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

Larry Lowell Ticknor has been charged in a two count indictment with (1) wilfully and knowingly making a false statement to the Small Business Administration (SBA) for the purpose of influencing the action of that Administration on the loan application of Robert E. Christensen and Leola Christensen in violation of 15 U.S.C. Sec. 645(a), and (2) conspiring with one Harold Dwyer to defraud the United States of America in violation of 18 U.S.C. Sec. 371. The defendant entered a plea of not guilty to both counts and subsequently, upon a signed waiver of a jury trial by the defendant and consent thereto by the United States Attorney for the District of South Dakota, was tried to the court without a jury. Upon the evidence adduced, this court makes the following:

## FINDINGS OF FACT

During the summer of 1960, Robert E. Christensen acquired the management of the Christensen Truck Line of Vermillion, South Dakota, from his father. A bachelor, Robert Christensen lived with his stepmother, Leola Christensen, at 523 West Cedar Street in Vermillion. Following his father's death in 1964, Robert and his stepmother continued to operate the truck line as a partnership from their residence. Robert Christensen was a hard-working truck line owner-operator who spent long hours at his business. He was well-regarded within the community and abstained from drinking, smoking or other unnecessary expensive habits.

The Christensen Truck Line was a seasonal operation engaged in the hauling of sand and gravel for local government subdivisions, as well as transporting grain and livestock. In the early part of 1965, Christensen was approached by the defendant, Larry Lowell Ticknor, with regard to Christensen's purchasing the trucking business of Dennis Freeburg. It was thought that that acquisition would relieve the seasonal aspects of the Christensen operation. Financed by a $23,000 loan from the bank employing the defendant, the United National Bank of Vermillion (UNB) [1], a bank with which Christensen had been a customer for a number of years, Christensen purchased the Freeburg business. At the time of the sale, UNB's loan to Freeburg was delinquent. Through the remaining portion of 1965, Christensen borrowed additional sums from UNB. Coincident with the arrangement for the proper security agreements, a $40,000 consolidation of Christensen's loans was negotiated on November 29, 1965, and he concluded the year $45,000 in debt to the bank. The Christensen loan account remained active throughout 1966, showing an indebtedness of $51,404.40 to UNB at the end of that year. The outstanding indebtedness of the Christensen loan account remained substantially unchanged through most of 1967, fluctuating between $40,000 and $46,000 until December.

Christensen does not recall encountering trouble meeting payments on his bank loans prior to the latter part of 1967. If a problem arose he would contact the defendant, Ticknor, and work out a means of meeting his obligations. Though Christensen's payments were irregular he attempted to stay current by obtaining extensions. From the bank loan data received in evidence (Exhibits 1, 2, 13), it can readily be seen that extensions were granted and additional loans made to Christensen throughout 1966 and 1967. Christensen had also been purchasing additional used equipment on credit during this period. A number of those pieces of equipment were financed through loan institutions in Sioux City, Iowa.

---

1. Prior to 1968 the United National Bank was known as the Citizen's State Bank.

In this decision the bank will be referred to as UNB or bank.

In 1967 UNB, a state chartered bank, chose to become chartered nationally. Consequently, in November, 1967, the bank was examined by National Bank Examiners. At the conclusion of that examination, and at the National Bank Examiners' direction, the Christensen loan was written off at the December 9, 1967, UNB board of directors' meeting. However, there were no foreclosure proceedings initiated against Christensen. An ensuing review by the National Bank Examiners restored the loan to an acceptable status and it was hand-posted to Christensen's loan sheet on January 23, 1968. Robert Christensen was never informed that his loan had been charged off.

Commencing with the last part of 1967 and running into the early portions of 1968, Christensen experienced difficulties meeting his note payments; he was delinquent in January, 1968. He approached Ticknor and inquired about an SBA loan. Ticknor explained that UNB did not participate in that government program and referred Christensen to a competing bank in Vermillion. Christensen obtained no satisfaction from the referral.

Robert S. Merhar of the SBA located in Sioux Falls, South Dakota subsequently solicited a contractual agreement between UNB and the SBA pursuant to a Blanket Loan Guaranty Agreement. Shortly thereafter, in January, 1968, defendant Ticknor assisted Christensen in the preparation of SBA loan application forms. Ticknor received $100 for this assistance. The application papers included Christensen's evaluation of his assets, typed by defendant's secretary. In a letter accompanying Christensen's SBA loan application, authored by the defendant and dated January 24, 1968, it is stated on page 2:

I feel that the Christensen Truck Line were properly financed the Christensen's would have no trouble whatsoever in keeping the business on a paying basis (sic). As you can see from the enclosed material they are substantial-ly handicapped by large payments and high interest rates which is robbing them of all their working capital. *In our years of experience with these people they have met all their obligations with us completely as agreed.* (Emphasis added).

The SBA relied upon this representation in both the initial application and in the reconsideration.

In general, the terms of the initial loan application sought to have SBA guarantee 90% of an $82,000 consolidation loan to Christensen, leaving the remaining 10% for bank participation. Following an independent credit bureau investigation and personal interviews by SBA with Christensen, including a review of his business records and a physical inspection of his equipment, that initial application was denied. Subsequently, the SBA agreed to reconsider the application subject to new provisions. The terms suggested by Ticknor for reconsideration were that one Harold Dwyer would guarantee $20,000 of the $82,000 loan, that UNB would increase its participation up to 25% of the loan instead of the original 10%, that within one year Christensen would sell his I.C. C. permit, a 1962 White Diesel Truck, and a flat-bed trailer, reducing his loan approximately $30,000, and that Christensen would not increase his fixed assets over $2,000 during the loan period without permission.

Christensen was directed to Harold Dwyer as a possible guarantor by Ticknor pursuant to the SBA request for a guarantor prior to reconsideration. Harold Dwyer was a physically handicapped, practicing attorney in Vermillion. Among his many financial interests was his position as a director on the board of UNB. Defendant Ticknor became acquainted with Dwyer when he joined the bank's staff in 1963. In 1965 Dwyer was confined to a wheelchair. In 1966 Dwyer befriended Ticknor, occasionally confiding in defendant about his business investments. Commencing in 1966 the two entered several business

ventures together; Ticknor acting as the "leg man" for Dwyer. Mr. Dwyer was known to be worth in excess of one million dollars, and was continually looking for additional investments. As a personal financial consultant to Dwyer, Ticknor counselled that Dwyer should guarantee a portion of the SBA loan. For a fee of $5,000 Dwyer agreed to act as Christensen's guarantor and, on April 9, 1968, Dwyer signed a UNB guaranty form which was submitted to the SBA as part of the reconsideration proposal.

The provisions of the application for reconsideration were found acceptable to the SBA and an $82,000 Simplified Blanket Loan Guarantee (SBLG), designed for consolidating Christensen's debts and improving his cash flow position, was authorized and, later, disbursed through UNB on April 10, 1968. On that date Robert and his stepmother, Leola Christensen, went to Ticknor's office, located in the United National Bank, and executed Cashier's Checks paying off their outstanding debts. Among those debts was the UNB loan to the Christensen Truck Line for $41,287.-80 which was liquidated. Then, Ticknor directed Robert Christensen to pay Dwyer's fee by having Christensen sign his personal check for $5,000 to Dwyer. The $5,000 check was left with Ticknor, as were the completed SBA loan forms. Neither of the Christensens had previously apprised Ticknor of the $5,000 fee. The SBA was never informed of the fee until after the loan was abandoned by the Christensens.

Harold Dwyer's Trust Account statement (Exhibit 15) discloses a $5,000 deposit on April 10, 1968, posted concurrently with two $2,500 checks. The $5,000 Christensen check was endorsed by Harold Dwyer. The joint checking accounts of Harold and Melba Dwyer (Exhibit 17) and Larry and Janet Ticknor (Exhibit 18) show $2,500 deposits on April 10, 1968, with checks drawn on the Harold Dwyer Trust Account. Each check is endorsed by the respective party.

Within one month Robert Christensen returned to Dwyer for financial assistance. Accompanied by an Internal Revenue Service (IRS) agent, Christensen went to Dwyer for a loan to satisfy a $2,500 to $2,600 federal tax liability. IRS was threatening foreclosure of the Truck Line. Following a private conference with Ticknor, Dwyer loaned Christensen approximately $3,000 to discharge the federal obligation. In consideration for lending Christensen the $3,000, defendant Ticknor, in a letter dated May 7, 1969, addressed to Dwyer, of his own volition and without authority from the board of directors, released Dwyer from his guaranty to UNB. SBA was not informed of this release.

Christensen made payments on the SBA loan through December, 1968. The winter of 1968–1969 saw an inordinate amount of snow accumulate in South Dakota. At Ticknor's request Christensen ceased operations, providing an interlude within which repairs could be made to equipment, which had fallen into a serious state of disrepair. Monthly payments were deferred by SBA from January 15, 1969, to July 15, 1969. Only the interest payments were required to be continued during this six month respite from principal payments.

Through the summer of 1969 Christensen continued to be delinquent in his payments. On August 15, 1969, at a meeting held at the bank, Christensen was told by the SBA representative that unless action was taken before August 31, 1969, on the two delinquent payments "it would be necessary for the bank and this Administration to give serious consideration to foreclosure and disposal." On September 5, 1969, the SBA was informed by Ticknor that the Christensens had left town, apparently abandoning their business and loan.

UNB formally requested that SBA take over the servicing and purchase of the guaranteed loan on September 9, 1969. On December 16, 1969, the SBA formally demanded of Harold Dwyer the honoring of his $20,000 guarantee. By

letter dated December 17, 1969, Dwyer complied with that demand. On December 26, 1969, Dwyer deposited $20,000 in his joint checking account, which $20,000 came from UNB. Mr. Dwyer died June 21, 1971.

An examination of UNB's Reserve for Losses (Exhibit 20) discloses these entries:

December 11, 1969—Charge off of $15,350.06 representing UNB's share of the loss on the Christensen SBA loan.

December 18, 1969—UNB charged off $20,000 attributed to the Robert Christensen loan.

April 16, 1970—The bank credited their Reserve for Losses $5,000 as their portion of the proceeds from the $20,000 guarantee proceeds sent to SBA by Dwyer.

## CONCLUSIONS OF LAW

The issues of this prosecution are not ones primarily of law, but of fact. In its entirety Count I of the indictment reads:

That on or about the 24th day of January, 1968, in the District of South Dakota, Larry Lowell Ticknor, an officer and employee of United National Bank in Vermillion, wilfully and knowingly made a false statement to the Small Business Administration for the purpose of influencing the action of the Administration on the loan application of Robert E. Christensen and Leola Christensen in that he appended a letter to that application stating "In our years of experience with these people they have met all their obligations with us completely as agreed", when in truth and in fact Robert E. Christensen and Leola Christensen had defaulted on a loan from the United National Bank of Vermillion, which the defendant well knew, in violation of 15 U.S.C. Sec. 645(a).[2] "The gravamen of the offense is the making of the false statement, knowing it to be false, for the purpose of obtaining the loan." Owen v. United States, 386 F.2d 774, 775 (5th Cir. 1967).

The rudiments of 15 U.S.C. Sec. 645(a) demand that the government prove beyond a reasonable doubt that the defendant knowingly made a false statement to influence the action of the SBA. There can be no doubt that the defendant made the statement attributed to him. The statement in question was contained in a two-page letter dictated to defendant's secretary and transmitted simultaneously with the Christensens' loan application to the SBA in Sioux Falls. The letter is subscribed by the defendant and he has, in fact, conceded authoring its contents.

The defendant knowingly made a false statement to influence the action of the SBA on the Christensen loan. The Christensens had not met all their obligations with UNB completely as agreed. Immediately prior to the authorization of the SBA loan in January, 1968, the Christensen loan was delinquent. In December of 1967 an objective, independent determination by the National Bank Examiners concluded that the quality, or the probability of repayment of the Christensen loan was of such a substandard nature as to call for the charging-off of the loan.

Viewing the repayment history of the Christensens as a whole, it would be thoroughly inconsistent with the objective records to find that these debtors were meeting their obligations as agreed. At best the repayment schedule of the Christensens could only be characterized as irregular or late. Their abili-

2. 15 U.S.C. Sec. 645(a) states:

Whoever makes any statement knowing it to be false, or whoever willfully overvalues any security, for the purpose of obtaining for himself or for any applicant any loan, or extension thereof by renewal, deferment of action, or otherwise, or the acceptance, release, or substitution of security therefor, or for the purpose of influencing in any way the action of the Administration, or for the purpose of obtaining money, property, or anything of value, under this chapter, shall be punished by a fine of not more than $5,000, or by imprisonment for not more than two years, or both.

ty to maintain some semblance of currentness was by obtaining numerous extensions. Based on the defendant's loan experience with the Christensens, the statement was false, and the defendant knew it to be untrue.

The purpose for making the false statement can also be gleaned from the surrounding circumstances. It was, of course, made to influence the SBA; this "glowing letter of credit" accompanied the Christensens' initial application and was designed to acquaint the SBA with the bank's loan experience with the Christensens. With regard to this credit consideration in passing upon the application, the SBA had no other source of information. It can be inferred from the Christensens' general inability to manage their business that the brief examination of their records afforded the SBA would not satisfactorily disclose the information necessary for determining the quality of notes outstanding with UNB. Therefore, it was to the bank and Ticknor that the SBA turned for accurate information disclosing the true nature of the Christensens in repaying previous obligations.

Commencing with the $23,000 Freeburg loan in 1965, and continuing through December of 1967, the Christensens were never able to completely discharge their loans or substantially decrease their indebtedness. To the contrary, their debt burden consistently grew in the succeeding years and they became a source of concern for the bank, which stood to lose approximately $40,000 in January of 1968. This pecuniary concern, coupled with the lure of a $5,000 fee shared equally between Dwyer and the defendant, Ticknor, supplied the purpose for knowingly making the false statement to the SBA.

This court hereby finds the defendant, Larry Lowell Ticknor, guilty beyond a reasonable doubt of the charge contained in Count I of the indictment. It is further found that the defendant is not guilty as charged in Count II of the indictment. The sentencing of the defend-

ant will be reserved until receipt by this court of a presentence report from the federal probation office.

This memorandum decision will constitute the findings of fact and conclusions of law required by Rule 23(c) of the Federal Rules of Criminal Procedure.